IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

|  |  |
|---|---|
| MARY M. KHAN<br><br>        Plaintiff,<br><br>    v.<br><br>ANDREW SAUL,<br>Commissioner of Social<br>Security,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civ. No. 19-00005 ACK-WRP

## ORDER AFFIRMING THE DECISION OF THE COMMISSIONER OF SOCIAL SECURITY

For the reasons discussed below, the Court AFFIRMS the decision of the Commissioner of Social Security.

## BACKGROUND

On June 3, 2014, Plaintiff Mary Khan ("Plaintiff") filed a Title II application for a period of disability and disability insurance benefits ("SSDI") and a Title XVI application for supplemental security income ("SSI"), alleging disability beginning on April 21, 2009.  Administrative Record ("AR") 27; 228–33; 238-44.  The applications were initially denied on February 2, 2015, and then denied upon reconsideration on May 18, 2015.  AR 163-66; 170-72.  Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which was held on July 26, 2016, and at which Plaintiff appeared and

testified.  AR 45-91.  At the hearing, Plaintiff amended her onset date to January 1, 2013.  AR 48.

On November 15, 2016, the ALJ issued his written decision finding that Plaintiff was not disabled.  AR 24-44.  On December 20, 2016, Plaintiff requested the Appeals Council review the ALJ's decision.  AR 222-23.  On July 9, 2018, the Appeals Council notified Plaintiff that it granted Plaintiff's request for review.  AR 4.  The Appeals Council informed Plaintiff that it would add Exhibit 16F to the record, which contained treatment notes from Plaintiff's treating doctor, Mary Myers, Ph.D.[1/]  AR 4.  The treatment notes were not previously entered into the record and were not addressed in the ALJ's hearing decision.  AR 4.  On August 26, 2018, Plaintiff's counsel indicated neither she nor Plaintiff had received the Appeals Council's July 9, 2018 correspondence, and on August 31, 2018, the Appeals Council granted Plaintiff 30 additional days to respond.  AR 4.  The Appeals Council received no additional

---

[1/] New Social Security regulations went into effect on January 17, 2017, compliance with which became mandatory on May 1, 2017.  See Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process, 81 FR 90987-01, 2016 WL 7242991 (Dec. 16, 2016).  These regulations impact the ability of a claimant to submit additional evidence to the Appeals Council not before the ALJ.  20 C.F.R. §§ 404.970; 416.1470. Specifically, the regulations require that the claimant show "good cause" for failure to timely submit the evidence to the ALJ before such evidence may be "considered" by the Appeals Council.  20 C.F.R. §§ 404.970(b); 416.1470(b). Because Plaintiff's case was pending at the Appeals Council before these regulations went into effect, the Social Security Administration informed Plaintiff that it would find good cause for any additional evidence she had already submitted as well as for any additional evidence she submitted before the Appeals Council issued its action in her case.  AR 16.

statement or evidence, and it adopted the ALJ's decision as its final decision on November 2, 2018.  AR 4–7.

Plaintiff filed a Complaint on January 5, 2019, seeking review of the denial of her applications for SSDI and SSI benefits.  ECF No. 1.  On May 31, 2019, Plaintiff filed her Opening Brief ("Opening Br.").  ECF No. 15.  On July 30, 2019, Defendant Andrew Saul, the Acting Commissioner of Social Security (the "Commissioner"),[2] filed his Answering Brief ("Ans. Br.").  ECF No. 16.  Plaintiff filed a Reply Brief ("Reply Br.") on August 29, 2019.  ECF No. 17.  The Court held a hearing on September 24, 2019.

## STANDARD

A district court has jurisdiction pursuant to 42 U.S.C. § 405(g) to review final decisions of the Commissioner of Social Security.[3]  A decision is not final until the Appeals Council either denies review or assumes jurisdiction and issues its own decision.  20 C.F.R. § 404.955.  "When the Appeals Council declines review, 'the ALJ's decision becomes the

---

[2] Andrew Saul was sworn in as the Commissioner of Social Security on June 17, 2019, after the Plaintiff initiated the briefing in this case. Pursuant to Federal Rule of Civil Procedure 25(d), a public officer's successor is "automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name."  Accordingly, the case caption reflects Mr. Saul as the named defendant, as do the Answering Brief and Reply Brief.

[3] 42 U.S.C. § 1383(c)(3) incorporates the judicial review standards of 42 U.S.C. § 405(g), making them applicable to claims for supplemental security income.

final decision of the Commissioner,' and the district court reviews that decision for substantial evidence, based on the record as a whole." _Brewes v. Comm'r of Soc. Sec. Admin._, 682 F.3d 1157, 1161-62 (9th Cir. 2012) (quoting _Taylor v. Comm'r of Soc. Sec. Admin._, 659 F.3d 1228, 1231 (9th Cir. 2011)). Where the Appeals Council grants review and issues a decision, the Appeals Council's decision becomes the final decision of the Commissioner. 20 C.F.R. §§ 404.969, 404.979. The reviewing court's task is then "to review the decision of the Appeals Council under the substantial evidence standard, not the decision of the ALJ." _Howard v. Heckler_, 782 F.2d 1484, 1487 (9th Cir. 1986).[4/]

A final decision denying Social Security disability benefits will not be disturbed by the reviewing district court if it is free of legal error and supported by substantial evidence. _See_ 42 U.S.C. § 405(g); _Dale v. Colvin_, 823 F.3d 941, 943 (9th Cir. 2016). In determining the existence of substantial evidence, the administrative record must be considered as a whole, weighing the evidence that both supports and detracts from the ALJ's factual conclusions. _See Gutierrez_

---

[4/] In order to make the discussion herein more readable, the Court generally refers to the ALJ and the ALJ's decision, as do the briefs submitted by both parties. _See generally_ Opening Br.; Ans. Br.; Reply Br. The Court does so with the understanding that the Appeals Council granted review of this case and it is the Appeals Council's decision formally in front of this Court; however, the Appeals Council's decision incorporated the findings and decision of the ALJ.

v. Comm'r of Soc. Sec., 740 F.3d 519, 523 (9th Cir. 2014).

"Substantial evidence means more than a scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (internal quotation marks omitted). "If the evidence can reasonably support either affirming or reversing, the reviewing court may not substitute its judgment for that of the Commissioner." Id. (internal quotation marks omitted). Rather, courts "leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record." Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1098 (9th Cir. 2014).

But reviewing courts must be cognizant of the "[l]ong-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking." Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1225-26 (9th Cir. 2009); see also S.E.C. v. Chenery Corp., 332 U.S. 194, 196 (1947) (if the grounds "invoked by the agency . . . are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis").

**<u>DISCUSSION</u>**

"To establish a claimant's eligibility for disability benefits under the Social Security Act, it must be shown that: (a) the claimant suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months; and (b) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy." <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999); <u>see also</u> 42 U.S.C. § 423(d)(2)(A). A claimant must satisfy both requirements in order to qualify as "disabled" under the Social Security Act. <u>Tackett</u>, 180 F.3d at 1098.

## I. The Social Security Administration's Five-Step Process for Determining Disability

The Social Security regulations set forth a five-step sequential process for determining whether a claimant is disabled. <u>Dominguez v. Colvin</u>, 808 F.3d 403, 405 (9th Cir. 2014); <u>see also</u> 20 C.F.R. § 404.1520(a)(4).[5/] "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps."

---

[5/] The relevant provisions governing SSI set forth in 20 C.F.R. Part 416 are identical to those for SSDI set forth in 20 C.F.R. Part 404. Accordingly, the Court will only cite to the latter regulations.

Ukolov v. Barnhart, 420 F.3d 1002, 1003 (9th Cir. 2005)
(citations omitted in original); see also 20 C.F.R.
§ 404.1520(a)(4).  The claimant bears the burden of proof as to
steps one through four, whereas the burden shifts to the ALJ for
step five.  Tackett, 180 F.3d at 1098; see also Valentine v.
Comm'r of Soc. Sec. Admin., 574 F.3d 685, 689 (9th Cir. 2009)
(noting that the burden shifts to the Commissioner at step five
to show that the claimant can do other kinds of work).

At step one, the ALJ will consider a claimant's work
activity, if any.  20 C.F.R. § 404.1520(a)(4)(i).  If the ALJ
finds the claimant is engaged in substantial gainful activity,
the ALJ will determine that the claimant is not disabled,
regardless of the claimant's medical condition, age, education,
or work experience.  20 C.F.R. § 404.1520(b).  Substantial
gainful activity is work that is defined as both substantial
(work activity involving significant physical or mental
activities) and gainful (work activity usually done for pay or
profit, whether or not a profit is realized).  20 C.F.R.
§ 404.1572.  If the ALJ finds that the claimant is not engaged
in substantial gainful activity, the analysis proceeds to step
two.  Tackett, 180 F.3d at 1098.

Step two requires that the ALJ consider the medical
severity of the claimant's impairments.  20 C.F.R.
§ 404.1520(a)(4)(ii).  Only if the claimant has an impairment or

combination of impairments that "significantly limits [her] physical or mental ability to do basic work activities" will the analysis proceed to step three. 20 C.F.R. § 404.1520(c). If not, the ALJ will find the claimant is not disabled and the analysis ends there. 20 C.F.R. § 404.1520(a)(4)(ii).

The ALJ also considers the severity of the claimant's impairments at step three. 20 C.F.R. § 404.1520(a)(4)(iii). Here, the ALJ will determine whether the claimant's impairments meet or equal the criteria of an impairment specifically described in the regulations. Id.; see also 20 C.F.R. Part 404, Subpart P, App. 1. If the impairments meet or equal these criteria, the claimant is deemed disabled and the analysis ends. 20 C.F.R. § 404.1520(a)(4)(iii). If not, the analysis proceeds to step four. 20 C.F.R. § 404.1520(e).

Step four first requires the ALJ to determine the claimant's residual functional capacity ("RFC"). Id. RFC is defined as the most the claimant can still do in a work setting despite her physical and mental limitations. 20 C.F.R. § 404.1545(a)(1). In assessing a claimant's RFC, the ALJ will consider all of the relevant evidence in the claimant's case record regarding both severe and non-severe impairments. 20 C.F.R. § 404.1545. The ALJ then uses this assessment to determine whether the claimant can still perform her past relevant work. 20 C.F.R. § 404.1520(e). Past relevant work is

defined as "work that [the claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. § 404.1560(b)(1). The ALJ will find that the claimant is not disabled if she can still perform her past relevant work, at which point the analysis will end. Otherwise, the ALJ moves on to step five.

In the fifth and final step, the ALJ will once again consider the claimant's RFC, as well as her age, education, and work experience, in order to determine whether the claimant can perform other work. 20 C.F.R. § 404.1520(a)(4)(v). Here, the ALJ is responsible for providing "evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do." 20 C.F.R. § 404.1520(g)(1). If the claimant is unable to perform other work, she is deemed disabled. 20 C.F.R. § 404.1520(g). If she can make an adjustment to other available work, she is considered not disabled. Id.

## II.  The Appeals Council's Decision

The ALJ issued his decision in this case on November 15, 2016. The Appeals Council granted review of that decision, and therefore the Appeals Council's November 2, 2018 decision was the Commissioner's final decision in this case. AR 1. In that final decision, the Appeals Council adopted the ALJ's (1)

statements regarding the pertinent provisions of the Social Security Act, Social Security Administration Regulations, Social Security Rulings and Acquiescence Rulings, the issues in the case, and the evidentiary facts; (2) findings and conclusions regarding whether Plaintiff is disabled; (3) findings under steps one, two, three, and four of the sequential evaluation; (4) conclusions regarding Plaintiff's statements concerning the alleged symptoms; and (5) conclusions regarding Plaintiff's mental impairment under the four functional areas requiring evaluation. AR 4-7. Aside from these statements, the Appeals Council did not discuss or evaluate the medical reports or other evidence that was before the ALJ.

The Appeals Council did add Exhibit 16F to the record, which was not addressed in the hearing decision or previously entered into the record. AR 4. The Appeals Council found that "Exhibit 16F do[es] not contain objective, clinical findings that would otherwise change the Administrative Law Judge's mental functional findings." AR 4; see also note 8, infra.

The ALJ's decision is therefore treated as the decision of the Appeals Council concerning the evaluation of the medical evidence and the credibility of plaintiff's subjective testimony.

**III.  The ALJ's Analysis**

The ALJ found that, at step one, Plaintiff had not engaged in substantial gainful activity since January 1, 2013— the amended alleged disability onset date—and at step two, that she suffered from the following severe impairments: depression; post-traumatic stress disorder (PTSD); and possible personality disorder.  AR 29-30.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 30-31. Specifically, the ALJ found that Plaintiff's mental impairments, considered singly and in combination, did not meet or medically equal the criteria related to depressive, bipolar and related disorders; anxiety and obsessive-compulsive disorders; and personality and impulse-control disorders.[6/]  Id.; 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04, 12.06, 12.08.

---

[6/] The Appeals Council noted that on September 26, 2016, the agency published final rules revising the medical criteria for evaluating the mental disorders, which became effective on January 17, 2017:

> Despite the changes to these functional areas, [the Appeals Council's] decision makes no change in translating the old criteria to the revised criteria based on the evidence of record which supports the findings.  As such, the Appeals Council adopts the Administrative Law Judge's conclusions regarding the degree to which the claimant's mental impairment: restricts the ability to understand, remember, or apply information (mild limitation); presents difficulties in interacting with others (moderate limitation); results in deficiencies in concentration, persistence or

(Continued . . .)

Moving to step four, the ALJ determined that Plaintiff had the RFC

> to perform a full range of work at all
> exertional levels but with the following
> nonexertional limitations: she is limited to
> simple routine, repetitive tasks; she is
> limited to occasional changes in work
> setting; she could not perform production
> rate pace work (that is, traditional
> assembly line work where another employee's
> performance is dependent on the immediate
> prior performance of the claimant); and she
> is limited to occasional interaction with
> the public but frequent interaction with
> coworkers and supervisors.

AR 31-32. Based on this RFC, the ALJ determined at step four that Plaintiff is capable of performing past relevant work as a data entry clerk. AR 38. This determination led the ALJ to find Plaintiff "not disabled" at step four. AR 38.

## IV. Plaintiff's Challenge on Appeal

Plaintiff does not challenge any of the findings the ALJ made at the first three steps.[7/] <u>See generally</u> Opening Br.

---

maintaining pace (moderate limitation); and limits the
ability to adapt or manage oneself (mild limitation)
(see Pages 4-5 of the [ALJ's] decision).
AR 5.

[7/] The Court notes Plaintiff's footnote 1 on page 13 of her Opening Brief. This footnote relates to the ALJ's assessment of the medical opinion provided by Dr. Jonas, a nonexamining psychiatrist contracted by the Social Security Administration. Dr. Jonas opined that Plaintiff had no "Medical Listing level limitations." Plaintiff states that she understands the ALJ to be citing to Dr. Jonas's opinion that Plaintiff did not meet a listed impairment at step 3. The Court agrees this statement references Dr. Jonas's opinion on step 3. It appears to this Court that the ALJ is using the step 3 opinion for his analysis at step 4, and the Court therefore understands Plaintiff to be challenging how that opinion is weighed at step 4. The Court has reviewed Plaintiff's objections to Dr. Jonas's testimony at pages 363-65 of the record regardless.

Plaintiff instead challenges the ALJ's determination at step four: that she is capable of performing past relevant work as a data entry clerk and is therefore "not disabled." She asserts that the ALJ improperly weighed or rejected the testimony of certain medical professionals, and that the ALJ erred in his analysis of Plaintiff's credibility. Opening Br. at 1-2, 10.

## V. Whether the ALJ Erred in His Assessment of Certain Medical Opinions

The ALJ considered medical opinions issued by six doctors in this case.[8/] Opening Br. at 14. While Plaintiff takes issue with the weight ascribed to each throughout her papers, see generally Opening Br., she characterizes her challenge in three parts: (1) that the ALJ failed to provide clear and convincing or specific and legitimate reasons to reject treating doctor, Dr. Myers's, opinions; (2) that the ALJ failed to provide clear and convincing or specific and legitimate reasons to reject Dr. Wingert's opinions; and

---

[8/] Plaintiff submitted additional Progress Notes from Dr. Myers to the Appeals Council, which the Appeals Council added to the record as Exhibit 16F. Despite the fact that these additional notes are part of the record before this Court, Plaintiff makes no reference to the additional notes in her briefing. The Court has reviewed Exhibit 16F, but because Plaintiff has not objected to the Appeals Council's assessment that "[t]he treatment records from Dr. Myers in Exhibit 16F do not contain objective, clinical findings that would otherwise change the Administrative Law Judge's mental functioning findings," AR 4, the Court does not consider their weight to be at issue. The Court's review of Exhibit 16F finds the notes to be consistent with other opinions submitted by Dr. Myers, and the Court addresses the ALJ's weighing of Dr. Myers's medical opinions as raised by Plaintiff. The Court notes that Dr. Myers's Progress Notes provided as Exhibit 16F do not cover any additional time period before or after the reports that were initially provided to the ALJ and raised in Plaintiff's papers. Compare Opening Br. at 15-18, with AR 723-34.

- 13 -

(3) that the ALJ failed to provide clear and convincing or specific and legitimate reasons to reject seven of Dr. Kiyota's opinions.  Opening Br. at 15-27.

### A. Standards for Weighing Medical Opinion Evidence

In assessing whether a claimant is disabled, the ALJ must "develop the record and interpret the medical evidence," considering the "'combined effect' of all the claimant's impairments," regardless of whether any one impairment, considered alone, would be of sufficient severity.  Howard v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) (citing Crane v. Shalala, 76 F.3d 251, 255 (9th Cir. 1996); 20 C.F.R. § 416.923). The ALJ is not obligated to discuss "every piece of evidence" where the evidence is "neither significant nor probative."  Id. Ultimately, "it is the responsibility of the ALJ, not the claimant's physician, to determine residual function capacity." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (citing 20 C.F.R. § 404.1545).

The applicable regulations state that the agency will consider all the medical opinions it receives. See 20 C.F.R. § 404.1527(b)-(c).  But in the realm of social security adjudications, medical opinions are not all created equal: "Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

(examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995); <u>see also</u> 20 C.F.R. § 404.1527(c). "Generally, the opinion of a treating physician must be given more weight than the opinion of an examining physician, and the opinion of an examining physician must be afforded more weight than the opinion of a reviewing physician."[9/] <u>Ghanim v. Colvin</u>, 763 F.3d 1154, 1160 (9th Cir. 2014) (citing <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1202 (9th Cir; 2001); 20 C.F.R. § 404.1527(c)).

"Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." <u>Ukolov</u>, 420 F.3d at 1004 (citation omitted). A treating physician's opinion should be given controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." <u>Ghanim</u>, 763 F.3d at 1160 (quoting <u>Orn v. Astrue</u>, 495 F.3d 625, 631 (9th Cir. 2007)) (alteration in original).

---

[9/] For claims filed on or after March 27, 2017, the treating source rule does not apply. <u>See</u> 20 C.F.R. § 404.1520c. Because Plaintiff filed her claim before March 27, 2017, the treating source rule does apply here. 20 C.F.R. § 404.1527; <u>see also</u> Answering Br. at n.6.

"Even if a treating physician's opinion is contradicted, the ALJ may not simply disregard it." Ghanim, 763 F.3d at 1161. Rather, to determine how much weight to give a treating physician's opinion, the ALJ must consider the following factors: the length of the treatment relationship and frequency of examination by the treating physician; the nature and extent of the treatment relationship between the patient and the treating physician; the supportability of the treating physician's opinion with medical evidence; the consistency of the treating physician's opinion with the record as a whole; and whether or not the treating physician is a specialist. Id.; 20 C.F.R. § 404.1527(c)(1)–(6).

An ALJ may only reject a treating physician's contradicted opinions by providing "specific and legitimate reasons that are supported by substantial evidence." Ghanim, 763 F.3d at 1161 (quoting Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008)). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [his] interpretation thereof, and making findings." Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting

Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)). "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." Id. at 1012–13.

Similarly, an examining physician's opinion is entitled to greater weight than that of a nonexamining physician. Lester, 81 F.3d at 830. The ALJ must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician; and if the opinion is contradicted by another physician, the ALJ can only reject it by providing specific and legitimate reasons that are supported by substantial evidence in the record. Id. at 830–31.

With this framework in mind, the Court considers whether the ALJ properly weighed the opinions of Plaintiff's physicians.

### B. Whether the ALJ Improperly Afforded "Only Some Weight" to the Medical Opinion of Treating Psychologist, Dr. Myers

#### i. The Medical Reports of Dr. Myers and the ALJ's Analysis

Dr. Myers is Plaintiff's treating psychologist and has been treating Plaintiff in individual psychotherapy since

October 9, 2012.  AR 34, 374.  Dr. Myers submitted five medical
reports to the agency, dated November 21, 2012, May 12, 2013,
August 18, 2014, June 3, 2016, and August 15, 2016.  AR 374,
375, 388-92, 683-85, 707-721.

Dr. Myers's November 21, 2012 report took the form of
a letter describing Plaintiff's diagnoses, background, and
treatment.  AR 374.  Specifically, she described daily survival
as a struggle for Plaintiff, which was exacerbated when
Plaintiff was required to comply with a 30-hour-per-week job
search requirement under the state of Hawaii's First to Work
Program.  Id.  Dr. Myers stated that the exemption Plaintiff
received from First to Work enabled her to enter treatment.  Id.
Dr. Myers stated that Plaintiff had progressed well in therapy
and had elected to forego medication but would be receptive to
medication if her psychotherapy did not show progress.  Id.  Dr.
Myers requested that Plaintiff "be granted a minimum of 6-12
months to continue her treatment and prepare for her future
employment plans," because Dr. Myers believed "this is necessary
in order to ensure her return to the workforce as a productive
worker."  Id.  The ALJ did not mention this report.  See AR 34-
35 (describing Dr. Myers's four other reports, beginning with
the May 12, 2013 report).

Dr. Myers's May 12, 2013 report provided "an update to
the previous report, dated 11/21/12."  AR 375.  After

reiterating Plaintiff's background, Dr. Myers opined that Plaintiff "has made good progress but is clearly not yet ready to return to employment. I would anticipate that she will require at least 6 months to be fully ready to become gainfully employed on a full time basis." Id. The ALJ considered the background provided in the report and understood that "in Dr. Meyers' [sic] opinion," Plaintiff "would likely be able to become fully gainfully employed after another six months of treatment." AR 34.

On August 18, 2014, Dr. Myers completed a form entitled "Report of Treating Mental Health Provider." AR 388-92. On that form, Dr. Myers indicated that she met with Plaintiff one to two times per month. AR 388. She provided narrative descriptions of Plaintiff as polite and pleasant, actively engaged in her treatment, and interested in being an excellent parent to her eight children, and Dr. Myers described her ability to relate as "excellent." AR 389-91. Dr. Myers found Plaintiff to have an IQ functioning in the average or above average range, and found Plaintiff displayed an "appropriate range of emotions given topics discussed." AR 389.

In response to questions regarding Plaintiff's RFC, Dr. Myers stated that Plaintiff was capable of understanding and remembering simple work instructions but "may not be able to do so consistently on [a] daily basis for employment," noting that

Plaintiff continued to struggle with past traumas.  AR 390.
Similarly, she opined that Plaintiff was "probably" capable of
maintaining regular job attendance and persisting at simple,
repetitive work tasks under ordinary supervision, "but may not
be able to do so consistently for employment as she is most
likely at or near her limit for coping [with] stressors of any
kind."  Id.  Dr. Myers again stated that social engagement was a
strength for Plaintiff as she relates and engages easily, but
concluded Plaintiff was "probably not" capable of
adapting/coping with a low-demand, entry-level job on a full
time consistent basis in an employment situation.  AR 391.

        The ALJ found this report the most persuasive of the
reports Dr. Myers submitted. AR 35.  The ALJ contrasted Dr.
Myers's "detailed findings" used "to support her conclusions" in
the August 18, 2014 report against the lack of detailed findings
used to support Dr. Myers's conclusions in her later-submitted
June 3, 2016 and August 15, 2016 reports.  Id.

        On June 3, 2016, Dr. Myers completed a form entitled
"Mental Health Questionnaire."  AR 683-85.  The form included:

        (1) a DSM-V Multiaxial Evaluation, where Dr. Myers
wrote "Posttraumatic stress disorder, Depression" on Axis I, and
wrote "single parent, economic hardship, no psychosocial support
network" on Axis IV;

(2) a check-box identification of signs and symptoms, where Dr. Myers checked eleven of thirty-two signs or symptoms;

(3) a check-box ranking of the ability to make necessary adjustment to maintain a job across a list of categories, where Dr. Myers indicated zero no limitations, five mild limitations, fourteen moderate limitations, three marked limitations, and zero extreme limitations;

(4) a check-box ranking of the degree to which the patient's mental health impairs her ability to function, where Dr. Myers indicated zero no limitations, one mild limitation, three moderate limitations, zero marked limitations, and zero extreme limitations;

(5) an expected average monthly work absence, where Dr. Myers wrote 5-6 days, "possibly more"; and

(6) an indication of whether the limitations have been present since the provided onset date, where Dr. Myers wrote "yes."

AR 683-85.  The ALJ referred to this report in his decision but found it "cursory" and "provided no detailed clinical findings, much less any significant rationale."  AR 34-35.

Finally, after the hearing before the ALJ, Dr. Myers submitted a fifth report in response to materials provided and questions posed by Plaintiff's attorney.  AR 707-21.  This report is dated August 15, 2016.  AR 721.  As described by

Plaintiff, "Dr. Myers' fifth opinion was designed to address Dr. Jonas' testimony about her August 18, 2014 opinion, but also to more fully address this earlier opinion."[10/]  Opening Br. at 17. Plaintiff's attorney quoted Dr. Myers's August 18, 2014 responses relating to Plaintiff's RFC and asked if these responses meant that Dr. Myers "found there to be no limitations on [Plaintiff's] ability to function or work."  AR 719-20.  Dr. Myers indicated this was not what she meant.  AR 720.  Dr. Myers then provided narrative responses to three questions regarding Plaintiff's limitations and condition.  AR 720-21.  Dr. Myers described Plaintiff's "difficulty sustaining attention" and her "very limited" threshold for stress tolerance, and indicated Plaintiff's "condition has worsened and she displays more depressive symptoms now as compared to 2012."  AR 720.  Dr. Myers stated that she does not think Plaintiff could function successfully at a job.  Id.

The ALJ appears to have misinterpreted the quotes from the August 18, 2014 report as new statements made on August 15, 2016.  AR 34-35.  Nevertheless, the ALJ considered the report and remarked on Dr. Myers's conclusion that Plaintiff's

---

[10/] Dr. Jonas is an impartial psychiatric expert, AR 34, contracted by the Social Security Administration to review Plaintiff's medical records and provide a medical opinion, Opening Br. at 7-8.  Dr. Jonas opined during the July 26, 2016 hearing that Plaintiff's record supports diagnoses of low-level depressedness, PTSD, and a personality disorder; but did not support more than mild functional limitations.  AR 34; 60-71.  Dr. Jonas provided additional responses to written interrogatories on June 17, 2016, essentially confirming this testimony.  AR 699-706.

condition has worsened.  AR 35.  The ALJ found the report
"offers mostly conclusions, and does not provide detailed
clinical findings to support her conclusion."  AR 35.

Considering Dr. Myers's reports together and based on
the above critiques, the ALJ ultimately gave Dr. Myers's opinion
"only some weight."  AR 35.  The ALJ criticized Dr. Myers's
reports as conclusory and lacking clinical findings that
supported her conclusions.  Id.  He found that "even treating
psychologist" Dr. Myers "assessed at least at one point,
moderate, and even mild, functional restrictions."  AR 35.  He
found the moderate or mild restrictions to be "at odds with her
conclusions of an inability to attend to and carry out tasks and
complete a workday," and found this conclusion was "not
consistent with the evidence as a whole."  AR 35.

The ALJ specifically found that the "very restricted
assessment offered" by Dr. Myers was "not supported by the
record in its entirety."  AR 35.  The ALJ contrasted Dr. Myers's
conclusory reports against Dr. Wingert's "very detailed report,"
to which he assigned greater weight to the extent that Dr.
Wingert found Plaintiff able to concentrate in a structured
setting and make simple work-related decisions.  AR 36.  The ALJ
likewise found Dr. Myers's conclusions to be inconsistent with
Dr. Kiyota's August 14, 2014 report, to which the ALJ assigned

significant weight, indicating that Plaintiff could cope with low demand, entry-level work.  Id.

### ii. The Parties' Arguments

Plaintiff argues the ALJ made three errors in limiting the weight afforded to Dr. Myers's reports: (1) the ALJ improperly relied on inconsistencies he found in Dr. Myers's reports to reject Dr. Myers's opinions, Opening Br. at 17-19; (2) the ALJ's comparison of Dr. Kiyota's August 14, 2014 report to Dr. Myers's reports was improper and relied on a misunderstanding Dr. Myers's last report, Opening Br. at 19; and (3) the ALJ's finding that Dr. Myers's reports were not supported by the record in its entirety relies on a mischaracterization of the record, Opening Br. at 19-20.

Plaintiff first argues that the ALJ erred in relying on inconsistencies he found in Dr. Myers's reports to reject her opinions.  Opening Br. at 17-19.  Plaintiff argues that Dr. Myers consistently referred to the presence of her disabling limitations, and that it is "improper to reject Dr. Myers' opinions because [these] limitations were not always present to the same degree."  Opening Br. at 18.  She cites Diedrich v. Berryhill, 874 F.3d 634 (9th Cir. 2017) at length for the proposition that "it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment" and "the absence of certain symptoms from" a particular medical

report "is insufficient to show a 'broader development' that [Plaintiff] did not experience those symptoms." Id. at 642 (quoting Garrison, 759 F.3d at 1017–18).

The Commissioner replies that there were numerous conflicting medical opinions in this case and the ALJ was responsible for resolving the conflicts. Ans. Br. at 10-11. The Commissioner argues that the ALJ reasonably found Dr. Myers's reports to be both internally inconsistent and inconsistent with the record. Ans. Br. at 12-15. The Commissioner points to the Appeals Council's consideration of additional progress notes submitted by Dr. Myers, which were not available to the ALJ, and which the Appeals Council held did not change the ALJ's findings.[11/] Ans. Br. at 15-16.

Plaintiff's second argument is that the ALJ erroneously found Dr. Myers's August 2014 report lacked detail while finding Dr. Kiyota's August 2014 report "much more detailed and well-reasoned." Opening Br. at 19. Plaintiff argues that Dr. Kiyota's August 2014 report was completed on the same form as Dr. Myers's August 2014 report, and was actually less detailed. Id. Further, Dr. Myers submitted additional information regarding her August 18, 2014 report after the

---

[11/] In particular, the Commissioner refers to the Appeals Council's July 9, 2018 letter to Plaintiff, indicating the Appeals Council's intent to find Plaintiff not disabled, wherein the Appeals Council stated Dr. Myers's progress notes showed Plaintiff to be alert and oriented, and her affect was euthymic except for one occasion. Ans. Br. at 15 (citing AR 225).

hearing in front of the ALJ, which the ALJ did not recognize built on her prior opinion.  Id.

The Commissioner replies that Plaintiff misunderstands the ALJ's comparison of Dr. Kiyota's August 2014 report.  Ans. Br. at 16-17.  The ALJ found that Dr. Kiyota's conflicting conclusions undermined Dr. Myers's opinion but did not directly compare the level of detail in Dr. Kiyota's report against the level of detail in Dr. Myers's report.  Ans. Br. at 17.  Rather, the ALJ's statements regarding Dr. Kiyota's "much more detailed" report contrasted Dr. Kiyota's several other check-box reports against Dr. Kiyota's August 2014 narrative report.  Id.

Lastly, Plaintiff argues that the ALJ excluded all opinion evidence regarding Plaintiff's disabling limitations in order to draw the conclusion that Dr. Myers's opinion was not supported by the record in its entirety.  Opening Br. at 19-20. In so doing, he mischaracterized the record, which Plaintiff argues was in error.  Id.

The Commissioner acknowledges that this record provides substantial evidence that could support a finding of disability or non-disability.  Ans. Br. at 15 n.9.  The Commissioner argues that because this record could support either outcome, the Court must affirm the ALJ's decision.  The ALJ here weighed the conflicting medical opinions by making "numerous specific findings" and by stating "what in the record

supported his findings." Id. Because the ALJ relied on substantial evidence in this record to limit the weight afforded to Dr. Myers's opinion, the Commissioner argues, the reviewing court is therefore required to uphold the ALJ's choice between reasonable interpretations. Id.

### iii. Analysis

The Court notes—and Plaintiff does not contest—that the ALJ provided specific reasons for limiting the weight he afforded to Dr. Myers's opinions. AR 34-35; Opening Br. at 20. At issue, then, is whether the specific reasons provided were legitimate and supported by substantial evidence. Garrison, 759 F.3d at 1012 (9th Cir. 2014) ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.")(quoting Ryan, 528 F.3d at 1198); see also Ans. Br. at 10 (arguing "the ALJ gave good, specific, legitimate reasons supported by substantial evidence for the weight he gave to all the medical source opinions.").

### 1. Inconsistencies Among Dr. Myers's Reports

"[I]t is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." Garrison, 759 F.3d at 1017. Where there is a

longitudinal picture of the claimant's therapeutic progress, an ALJ should consider the claimant's "overall well-being and the nature of her symptoms." Id. The mere absence of certain symptoms from a single medical report "is insufficient to show a 'boarder development' that [the claimant] did not experience those symptoms." Diedrich v. Berryhill, 874 F.3d 634, 642 (9th Cir. 2017).

Here, the ALJ did not selectively rely on Dr. Myers's findings regarding Plaintiff's capabilities to the exclusion of those regarding Plaintiff's limitations. Rather, the ALJ took pains to compare the reports Dr. Myers provided in order to assess the more restrictive findings that Dr. Myers made. Plaintiff points to the ALJ's statement that Dr. Myers "assessed at least at one point" moderate or mild restrictions, which the ALJ found at odds with Dr. Myers's report that Plaintiff could not carry out tasks and complete a workday. AR 35. But the ALJ's argument in so writing was that Dr. Myers's own findings did not support her conclusions. The ALJ reviewed Dr. Myers's reports and explained his decision to limit the weight afforded to them based on the lack of support or clinical findings contained therein, and Plaintiff misconstrues the ALJ's decision to the extent that Plaintiff argues that the ALJ limited their weight because Plaintiff's symptoms waxed and waned over the course of her treatment. AR 35.

The Court rejects Plaintiff's first contention that the ALJ improperly limited the weight it afforded Dr. Myers's opinion because Plaintiff's reported limitations fluctuated between reports.

## 2. Comparing Dr. Myers's Reports to Dr. Kiyota's August 2014 Report

Plaintiff next argues that the ALJ improperly found Dr. Myers's reports lacked detail where the ALJ simultaneously found that Dr. Kiyota's shorter responses in her August 2014 report contained more detail. Plaintiff encourages a side-by-side comparison of Dr. Kiyota's August 2014 report against Dr. Myers's August 2014 report, each of which was completed on the same form. Opening Br. at 19.

Plaintiff appears to misunderstand the nature of detail to which the ALJ refers. The ALJ is not merely counting total words used, in which case Dr. Myers's reports would certainly weigh heavier. Instead, the ALJ afforded significant weight to Dr. Kiyota's August 2014 report because "her conclusions are supported by her own findings." AR 36. The ALJ apparently found the details provided in Dr. Kiyota's August 2014 report consistent with the conclusions she provided; namely, that Plaintiff could cope with low demand, entry-level work, could understand and remember simple work instructions, could maintain regular job attendance and persist at simple work

tasks on a consistent basis, and could get along with others with minimal contact. Id.

In contrast, the ALJ found Dr. Myers's reports lacked the type of details that would support her conclusions. This was particularly true in Dr. Myers's August 2014 report, to which Plaintiff urges the instant comparison. Dr. Myers's August 2014 report did contain some specific findings of Plaintiff's limitations. For example, Dr. Myers stated that Plaintiff was coping with multiple psychosocial stressors and had a limited psychosocial support network, and continued to struggle with past traumas. Dr. Myers also that indicated Plaintiff's coping resources were compromised as a result of past traumas and multiple deaths in her family, as well as being a single parent of eight kids. AR 388-91. But Dr. Myers also provided a number of findings regarding Plaintiff's capabilities. For example, Dr. Myers stated that Plaintiff performed all activities of daily living, provided for the needs of her eight children as a single parent, managed her own funds, had an interest in being an excellent parent to her kids, had an excellent ability to relate, engaged with others easily and was pleasant, displayed an appropriate range of emotions given the topics discussed, had an "X3" cognitive status, and had an estimated IQ functioning in the average or above average range. AR 388-91.

The ALJ found these latter descriptions inconsistent with Dr. Myers's conclusions regarding Plaintiff's inability to work. Further, when providing her assessment of Plaintiff's limitations, Dr. Myers was surprisingly equivocal. When asked if Plaintiff was capable of maintaining regular job attendance and persisting at simple, repetitive work tasks, Dr. Myers responded "probably." AR 390. Dr. Myers went on to qualify that response by remarking Plaintiff "may not be able to do so consistently for employment." Id. Likewise, when asked if Plaintiff was capable of adapting/coping with a low-demand, entry-level job, Dr. Myers responded "[p]robably not on a full time consistent basis in an employment situation." AR 391. The ALJ found these responses comparably less supported than Dr. Kiyota's analogous responses of "yes" to the same questions. Compare AR 34 with 36.

The ALJ found Dr. Kiyota's report better supported by her own findings and consistent with other evidence in the record. AR 36. In contrast, the ALJ found Dr. Myers's reports conclusionary and lacking in the type of detail that supported her findings. AR 34-35. The evidence here reasonably and substantially supports this conclusion and the ALJ did not err in so finding.

### 3. The ALJ's Characterization of the Record

Plaintiff's third argument is that the ALJ improperly characterized the record to exclude all opinion evidence of Plaintiff's disabling limitations.  Specifically, Plaintiff argues that the ALJ improperly found that Dr. Myers's reports were "not supported by the record in its entirety."  Opening Br. at 19-20; AR 35.

The record "in its entirety" consisted of:

(1) Dr. Myers's five opinions, at issue here;

(2) Dr. Wingert's opinion, concluding Plaintiff "could maintain adequate concentration and attention in a structured setting, and demonstrated sufficient cognitive ability to make simple work related decisions," but that Plaintiff's "symptoms of withdrawal and irritability could interfere with her ability to interact with the public and get along with coworkers," and her "depressive symptoms might limit her ability to complete a normal workday," AR 36;

(3) Dr. Kiyota's August 2014 report, concluding Plaintiff could cope with low demand, entry-level work, AR 36;

(4) Dr. Kiyota's seven State of Hawaii Department of Human Services mental health reports (the "DHS reports"), covering the period from about June 2013 to March 2016, which commonly indicated Plaintiff could not function for as much as half of the day, AR 36;

(5) the conclusions of two nonexamining State agency psychological consultants who reviewed some, but not all, of the reports by Dr. Myers, Dr. Kiyota, and Dr. Wingert, and who opined Plaintiff "could engage in simple routine tasks involving minimal contact with others, and could adapt to routine changes and make simple plans," AR 37;

(6) the conclusions of nonexamining doctor, Dr. Jonas, who found Plaintiff has no more than mild functional limitations, AR 34; and finally

(7) Plaintiff's own testimony, wherein she stated she could not get through a workday and could not maintain attendance for full time employment, AR 38.

The ALJ reviewed each of these pieces of the record in his decision. After his review, he afforded significant weight to Dr. Kiyota's August 2014 report, significant weight to the conclusions of the State agency psychological consultants, relatively greater weight, but not full weight, to the opinion of Dr. Wingert (but not including Dr. Wingert's conclusion that Plaintiff's depressive symptoms might limit her ability to complete a normal workday), some weight to the opinion of Dr. Myers, and limited weight to Dr. Kiyota's seven DHS reports. AR 34-37. The ALJ appeared to find some credibility in Plaintiff's testimony but did not fully credit the severity with

which Plaintiff testified she experienced her symptoms.  AR 32-33, 37-38.

Because Dr. Myers was the treating doctor, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence to limit the weight he afforded her testimony.  Ghanim, 763 F.3d at 1161.  The ALJ here did so "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [his] interpretation thereof, and making findings."  Tommasetti, 533 F.3d at 1041. After reviewing Dr. Myers's reports, the ALJ explained the reports were contradicted by the overall impression of Dr. Wingert, whose findings the ALJ likewise reviewed.  AR 35-36. The ALJ found Dr. Myers's reports contradicted by Dr. Kiyota's August 2014 report, and reviewed the conflicting findings therein.  AR 36.  The ALJ found Dr. Myers's reports lacking in detail and conclusory.  AR 34-35.

Indeed, a review of Dr. Myers's reports shows that, aside from a recitation of Plaintiff's undeniably traumatic history, Dr. Myers largely fails to provide concrete observations that would plainly support Plaintiff's limitations. Nor does Dr. Myers provide substantiation of clinical and laboratory diagnostic techniques used that might support her conclusions, which would be required to give even an uncontradicted treating doctor's opinion controlling weight.  20

C.F.R. § 404.1527(c)(2) (providing controlling weight where the "nature and severity" of the impairments described are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence" in the case record).

Although the ALJ did not specifically mention Dr. Myers's November 21, 2012 report, the ALJ is not obligated to discuss "every piece of evidence" where the evidence is "neither significant nor probative." Howard v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003). The ALJ did review Dr. Myers's May 12, 2013 report, which Plaintiff herself admits is "similar." AR 374-75; Opening Br. at 15-16.

The ALJ properly resolved the clear conflicts in this record by presenting specific and legitimate reasons that were supported by substantial evidence. To the extent that Plaintiff takes issue with the ALJ's use of the phrase "the record in its entirety," the Court rejects the semantic point. A plain reading of the ALJ's decision shows that the ALJ acknowledged that the record contained evidence both in support of and in opposition to Dr. Myers's reports. When referring to "the record in its entirety," the ALJ was referring to the record as he characterized it, and the ALJ nowhere suggested that the record contained only evidence contrary to Dr. Myers's opinion.

The Court affirms the ALJ's decision with regard to Dr. Myers's medical opinion.

**C. Whether the ALJ Improperly Weighed Dr. Wingert's Opinion**

**i. The Medical Report of Dr. Wingert and the ALJ's Analysis**

Dr. Wingert, an examining doctor, served as a Consultative Examiner. He provided a six-page narrative describing his January 20, 2015 examination of Plaintiff. AR 394-99. He provided (1) behavioral observations and interview information, AR 394-96; (2) the results of a cognitive and learning assessment, AR 396-97; (3) an assessment of Plaintiff's emotional status and personality, AR 397-98; (4) a diagnostic impression, AR 398; and (5) a formulation summarizing his conclusions. AR 398-99.

The ALJ found that Dr. Wingert's detailed report substantiated portions of his ultimate opinion. Specifically, the ALJ found that Dr. Wingert's findings supported his conclusion that Plaintiff

> could maintain adequate concentration and attention in a structured setting, and demonstrated sufficient cognitive ability to make simple work related decisions. Dr. Wingert allowed that the claimant's symptoms of withdrawal and irritability could interfere with her ability to interact with the public and get along with coworkers. To this extent, the undersigned therefore gives relatively greater weight, but not full weight, to Dr. Wingert's opinion.

AR 36.  The ALJ went on to discount Dr. Wingert's suggestion

that Plaintiff's "depressive symptoms might limit her ability to

complete a normal workday," because the ALJ found "this is not

evident from any of the findings from the exam and appears

mainly derived from the claimant's subjective reports."  Id.

### ii. The Parties' Arguments

Plaintiff argues the ALJ improperly rejected Dr.

Wingert's suggestion that Plaintiff "may well be limited in her

ability to complete a normal workday and workweek without

interruptions from her psychologically-based symptoms."[12]

Opening Br. at 22; AR 406.  Plaintiff argues the ALJ erred by

forming his own differing opinion from Dr. Wingert's clinical

findings; by finding Plaintiff's subjective reports to the

doctor not credible when Dr. Wingert himself found them to be

---

[12] In her Opening Brief, Plaintiff also argues that the ALJ erred when
he adopted Dr. Wingert's finding that Plaintiff could maintain adequate
concentration and attention "in a structured setting," but omitted this from
the RFC finding.  Plaintiff withdrew this argument at the hearing on
September 24, 2019.  In Dr. Wingert's report, Dr. Wingert wrote: "In this
structured setting, [Plaintiff] maintained adequate attention and
concentration, although she may well have difficulties doing so in a less
supportive environment."  AR 399.  During the hearing before the ALJ, the
vocational expert testified that "[d]ata entry actually allows [for a
limitation to] simple, routine, repetitive [tasks] so long as there's
structure."  AR 86.  The ALJ asked, "[a]nd is there structure?"  Id.  The
vocational expert affirmed there is.  Id.  In finding that Plaintiff is
capable of performing past relevant work as a data entry clerk, the ALJ
remarked that "[t]he vocational expert explained that while the DOT
classification indicates the work could be semiskilled, the type of data
entry work, which constitutes the claimant's past relevant work, involves
simple routine repetitive tasks, because there is sufficient structure in the
work."  AR 38.

credible; and by refuting Dr. Wingert's opinion by citing to
Plaintiff's "conservative treatment."  Opening Br. at 22-24.
The Commissioner responds that the ALJ properly parsed the self-
explanatory findings in Dr. Wingert's examination record,
adopting the portions of Dr. Wingert's opinion that were
supported and rejecting the portions that were speculative, and
that the ALJ was entitled to rely on other evidence in the
record regarding Plaintiff's treatment history in order to
reject part of Dr. Wingert's conclusion.[13/]  Ans. Br. at 18-21.

### iii. Analysis

Where the ALJ ascribed relatively greater weight to
the bulk of Dr. Wingert's opinion, the ALJ specifically rejected
Dr. Wingert's suggestion regarding Plaintiff's ability to
complete a normal workday without interruption.  AR 36.  The ALJ
did so because he thought the suggestion was mainly derived from
Plaintiff's subjective reports and was inconsistent with a
treatment that involved only low-dose medication and therapy.
Id.

---

[13/] The Commissioner adds in a footnote that other non-examining doctors
reviewed Dr. Wingert's examination notes and opined Plaintiff would have
simple or no limitations.  Ans. Br. at 21 n.10.  Although the ALJ may
consider these separate opinions, the ALJ did not here cite these opinions as
the basis for rejecting Dr. Wingert's conclusion regarding Plaintiff's
ability to complete a normal workday.  The Commissioner cannot provide
additional support not relied on by the ALJ.  Bray, 554 F.3d at 1225-26.

The Court finds the ALJ did not err in rejecting one of Dr. Wingert's suggestions while giving relatively greater weight to the remainder of Dr. Wingert's opinion.

### 1. The ALJ's Interpretation of Dr. Wingert's Conclusions

The Court disagrees that the ALJ improperly formed his own medical opinion by reinterpreting Dr. Wingert's raw data. An ALJ is permitted to evaluate the bases provided for a medical opinion and, considering the record as whole, determine certain portions are supported while other portions are not. See Bayliss v. Barnhart, 427 F.3d 1211, 1216-17 (9th Cir. 2005) (affirming the ALJ's rejection of parts of certain medical opinions). That is what the ALJ did here, and to do so was not in error.

The cases Plaintiff cites do not hold otherwise. Plaintiff appears to cite Revels v. Berryhill, 874 F.3d 648, 655 (9th Cir. 2017) and Lester, 81 F.3d at 831, for the proposition that an ALJ may not rely on the opinion of a nonexamining doctor alone in order to reject the opinion of an examining or treating doctor. The ALJ did not do so here.

Here, the ALJ relied on the findings of the examining doctor, Dr. Wingert, and found they did not support that same doctor's concluding suggestion that Plaintiff "may well be limited in her ability to complete a normal workday and workweek

without interruptions from psychologically-based symptoms."
AR 399. The ALJ went on to articulate that he found the
unsupported suggestion by Dr. Wingert based mainly on
Plaintiff's subjective reports and not supported by Plaintiff's
medical record evidencing a conservative treatment (the
characterization of "conservative treatment" was in turn
supported by the statement of nonexamining doctor, Dr. Jonas,
regarding Plaintiff's "very low" dose of medication). Lester
itself recognizes that this is permissible. 81 F.3d at 831 ("We
have, in some cases, upheld the Commissioner's decision to
reject the opinion of a treating or examining physician, based
in part on the testimony of a nonexamining medical advisor.").

Plaintiff also cites to Day v. Weinberger, 522 F.2d
1154, 1156 (9th Cir. 1975) and Padilla v. Astrue, 541 F. Supp.
2d 1102, 1106 (C.D. Cal. 2008). While Day did state that the
hearing examiner "was not qualified as a medical expert," that
case involved an examiner who went "outside the record to
medical textbooks for the purpose of making his own exploration
and assessment as to claimant's physical condition." 522 F.2d
at 1156. The ALJ took no independent research mission here,
relying instead on the evidence in the record. In Padilla, the
ALJ rejected the claimant at step two in the five-step process,
where the ALJ determined the claimant lacked a medically severe
impairment or combination of impairments. 541 F. Supp. 2d

at 1106. First, the standard at step two is distinct: the ALJ
may only find a claimant lacks the requisite impairment when
that conclusion is "clearly established by medical evidence."
Id. Second, the court's statement that an ALJ, as a lay person,
is "not qualified to interpret raw medical data in functional
terms" was the basis for its conclusion that an ALJ "may not
properly find that a claimant has a certain capacity to perform
work-related activities without the support of a physician's
medical assessment." Id. The rationale in Padilla does not
apply here, where the ALJ found Plaintiff did have severe
medical impairments at step two and had the support of multiple
physicians' assessments regardless.

### 2. Dr. Wingert's Reliance on Plaintiff's Subjective Reports

The Court finds the ALJ permissibly relied, in part,
on Plaintiff's subjective reports to Dr. Wingert as a basis for
rejecting one of Dr. Wingert's suggestions. Where an ALJ
determines that a claimant's "description of her limitations
[are] not entirely credible," an ALJ may reasonably discount
evidence from a physician "that was based on those less than
credible statements." Bray, 554 F.3d at 1228; see also
Magallanes v. Bowen, 881 F.2d 747, 753 (9th Cir. 1989) ("It is
not necessary to agree with everything an expert witness says in
order to hold that his testimony contains 'substantial

evidence.") (quoting Russell v. Bowen, 856 F.2d 81, 83 (9th Cir.1988)).

The Ninth Circuit held in Ryan v. Commissioner of Social Security, 528 F.3d 1194 (9th Cir. 2008) that "an ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations." Id. at 1199-200. But Ryan also held that "[a]n ALJ may reject an examining physician's opinion if it is contradicted by clinical evidence." Id. at 1199.

The ALJ here reviewed the clinical evidence provided by Dr. Wingert: that Dr. Wingert "noted that [Plaintiff] presented as distracted and distraught . . . but her responses to self-inventories reflected only a low level of depression and concerns of anxiety but not at clinical level." AR 35. Dr. Wingert administered the WAIS-IV, at which Plaintiff was "able to persist" and "demonstrate[ed] an average range of intellectual function." Id. The ALJ pointed to a number of additional observations by Dr. Wingert and concluded these observations substantiated most of Dr. Wingert's opinion. AR 36. Where the ALJ found Plaintiff's statements that she could not get through a workday incredible as "not supported" by the record, it was not an error for the ALJ to find Dr.

Wingert's conclusions regarding the same to be unsubstantiated as apparently "mainly derived from the claimant's subjective reports" and "not evident from any of the findings from the exam." Id.; see also Tommasetti, 533 F.3d at 1041 ("An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible.") (quoting Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 602 (9th Cir. 1999)). The ALJ here further supported his decision to discount this part of Dr. Wingert's testimony by relying on evidence of Plaintiff's conservative treatment. AR 36.

Because Dr. Wingert's suggestion regarding Plaintiff's potential inability to complete a normal workday or workweek was contradicted by other medical evidence in the record, the ALJ needed only provide specific and legitimate reasons supported by substantial evidence in order to reject it. Lester, 81 F.3d at 830–31. The ALJ did so here.

### 3. Plaintiff's Conservative Treatment

Plaintiff argues the ALJ could not reject a part of Dr. Wingert's opinion for what the ALJ deemed conservative treatment.[14/] But this circuit permits an ALJ to rely on

---

[14/] After stating that Plaintiff's treatment was conservative, "consisting only of a very low dosage of a single antidepressant medication and therapy," the ALJ cited to Dr. Wingert's own report. AR 36. During Dr. (Continued . . .)

evidence of conservative treatment.  Parra v. Astrue, 481 F.3d
742, 751 (9th Cir. 2007) ("We have previously indicated that
evidence of 'conservative treatment' is sufficient to discount a
claimant's testimony regarding severity of an impairment.")
(citing Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir.1995)).
Although evidence of conservative treatment is usually used as a
basis to discount a claimant's own testimony as to the severity
of her symptoms, it has also been relied on as a basis to
discount a medical opinion.  Rollins v. Massanari, 261 F.3d 853,
856 (9th Cir. 2001) ("Dr. Young described [the claimant] as a
'[w]ell developed, well nourished middle aged female in no acute
distress' and prescribed a conservative course of treatment,"
which were "not the sort of description and recommendations one
would expect to accompany a finding that Rollins was totally
disabled under the Act.").

    Reviewing courts have taken it upon themselves to
determine what type of treatment is properly considered
conservative.  In Parra v. Astrue, 481 F.3d 742, 751 (9th Cir.

---

Wingert's January 2015 examination, Plaintiff reported that she had been
seeing Dr. Myers every two weeks since October 2012.  AR 397.  But at the
time of Dr. Wingert's report—two years after Plaintiff's amended alleged
onset date—Dr. Wingert wrote that Plaintiff did not report taking any
prescription medications on a regular basis.  AR 396.  At the time of the
hearing, Plaintiff reported she was taking ten milligrams of Lexapro per day
in response to Dr. Jonas's inquiry, which Dr. Jonas characterized as a "very
low" dose.  AR 66.  Since the ALJ cited to this low dosage rather than Dr.
Wingert's statement that Plaintiff reported taking no medication, the Court
understands the ALJ to have incorporated the hearing testimony alongside Dr.
Wingert's report.  AR 36.

2007), treating a physical ailment with over-the-counter pain medication was deemed conservative.  In Tommasetti v. Astrue, 533 F.3d 1035, 1039-40 (9th Cir. 2008), the record showed the claimant had responded favorably to physical therapy, anti-inflammatory medication, a nerve stimulation unit, and a lumbosacral corset in response to a back condition.  "Such a response to conservative treatment undermines Tommasetti's reports regarding the disabling nature of his pain."  Id. at 1040.  In Bowman v. Colvin, 228 F. Supp. 3d 1121, 1130 (D. Or. 2017), the court upheld the ALJ's decision to only consider treatment since the alleged onset date, and found that a single successful surgery, a failure to follow through with occupational therapy, medication for hip pain, and a patch for vertigo were "fairly conservative."

In contrast, the court in Carmickle v. Commissioner, Social Security Administration, 533 F.3d 1155, 1162 (9th Cir. 2008) rejected reliance on a conservative course of treatment where the claimant had testified that he did not take more medication because of adverse side effects and because his insurance would not cover a preferred medication—testimony which was corroborated by his doctor.  In Garrison v. Colvin, 759 F.3d 995, 1015 (9th Cir. 2014), the court rejected epidural injections and physical therapy as conservative where the medical records made clear the treatment provided no relief for

the claimant's neck pain.  Finally, in O'Connor v. Berryhill,

355 F. Supp. 3d 972, 985 (W.D. Wash. 2019), the court found that

"pain treatment with opioid analgesics generally is not

considered conservative."

Although Plaintiff testified that she has not asked

for an increase in her medication because she is not sure her

medication is helping her at all, AR 62, this does not rise to

the type of medical corroboration described in Carmickle or

Garrison.  Nor does this Court find a low dose of an

antidepressant equivalent to a narcotic.  See O'Connor, 355 F.

Supp. 3d 972.  The ALJ stated he was looking for some record of

acute intervention or intensive therapies, which were not

present on this record.  AR 38.  Where there is a psychiatric

medical opinion characterizing Plaintiff's dosage as "very low"

and Plaintiff has not provided medical support substantiating

the conservative treatment as ineffective for the nature of her

symptoms, the Court finds the ALJ's decision substantially

supported.

Plaintiff cites to Goodwin v. Comm'r of Soc. Sec.

Admin., No. CIV. 09-00469 LEK, 2011 WL 4498962, at *5 (D. Haw.

Sept. 26, 2011) for the proposition that conservative treatment

should play a limited role in assessing credibility in mental

health cases.  The court in Goodwin rejected an ALJ's

characterization of mental health care as "conservative

treatment" because the court found it inconsistent with the record as a whole, where the plaintiff had been treated with prescription medications and therapy. Id. at 5. The Court recognizes that here, Plaintiff has likewise been treated with prescription medication and therapy. However, the ALJ had additional evidence to support characterizing this Plaintiff's treatment as conservative: the testimony of the psychiatric expert regarding Plaintiff's low dosage. AR 66. Further, the conservative treatment is not the only basis for rejecting Dr. Wingert's suggestion; rather, it is Dr. Wingert's lack of supporting exam results coupled with Plaintiff's conservative treatment that undermine Dr. Wingert's suggestion of Plaintiff's potential limitations. AR 36.

> **D. Whether the ALJ Improperly Afforded "Only Limited Weight" to the DHS Mental Health Reports by Dr. Kiyota**

> > **i. The Medical Reports of Dr. Kiyota and the ALJ's Analysis**

Dr. Kiyota, an examining doctor, submitted eight reports. The August 14, 2014 report, which the ALJ assigned significant weight, has been discussed supra.

The remaining seven of Dr. Kiyota's reports were filled out as part of Plaintiff's application to the State of Hawaii Department of Human Services for state disability benefits. Dr. Kiyota is a state psychiatric examiner who examined Plaintiff approximately every six months between June

2013 and March 2016.  AR 379-82, 558-90.  Each report was filled out on the same form, consisting largely of check boxes.  Id. The reports included sections regarding disorders, diagnostic impressions, and employability determinations.  Id.  The reports commonly indicate that Plaintiff has moderate restrictions, defined by the report as an inability to function for as much of half the day.  Id.  Dr. Kiyota checked the box on these forms indicating Plaintiff could not work, or could only work for 30 hours or less with specific accommodations, which qualified her for public assistance.  Id.; AR 36.

Dr. Kiyota's seven reports suggest some improvements and then regression over time.  The reports mark Plaintiff with moderate limitations—defined as an inability to function half of the time—in a few categories, and two of the reports (from December 2013 and March 2016) list Plaintiff as very limited— defined as unable to function three-quarters of the time—in the category regarding capability of adapting/copying with a low demand, entry-level job.  AR 382, 562, 567, 574, 579, 585, 590.

The DHS reports also have a section for employability. Dr. Kiyota's conclusions regarding Plaintiff's employability vary over time.  Dr. Kiyota's first report in June 2013 concludes that Plaintiff is unable to participate in any activities except treatment.  AR 590.  Then, in December 2013, Dr. Kiyota finds Plaintiff able to participate in activities

less than 30 hours weekly with reasonable accommodations; those reasonable accommodations being that Plaintiff cannot be around people. AR 585. This same finding, that Plaintiff is able to participate in activities less than 30 hours weekly with reasonable accommodations, is repeated in Dr. Kiyota's May 2014, October 2014, and April 2015 reports, although these latter three reports also indicate that as a reasonable accommodation, Plaintiff must avoid stress. AR 382, 574, 579. Notably, the August 2014 report, provided on a separate form and to which the ALJ affords significant weight, is written between these DHS reports.

Dr. Kiyota's last two DHS reports, written in September 2015 and March 2016, again list Plaintiff as unable to participate in any activities except treatment. AR 562, 567. All seven of the DHS reports were certified by two additional doctors who reviewed the forms and signed off on them.

The ALJ afforded limited weight to Dr. Kiyota's DHS reports "because they are conclusory and cite very few clinical findings, and because the conclusions reached in these reports are not consistent with the medical and other evidence," or with Dr. Kiyota's August 2014 report. AR 36. The ALJ specifically noted that Dr. Kiyota provided a Global Assessment of Functioning ("GAF") score at about 55, which he found

inconsistent with Dr. Kiyota's indication that Plaintiff could not function for as much as half the day.  Id.

### ii. The Parties' Arguments

Plaintiff argues that the ALJ improperly rejected Dr. Kiyota's seven State of Hawaii DHS reports.  Plaintiff first emphasizes that the DHS examinations are performed through a joint program with the Social Security Administration and use identical criteria to determine if the claimant is disabled. Opening Br. at 25.  She next argues that the ALJ afforded Dr. Kiyota's August 2014 report significant weight because it was much more detailed and well-reasoned than the DHS reports, and was supported by Dr. Kiyota's own findings in the previous DHS examinations.  Opening Br. at 26.  But, Plaintiff argues, Dr. Kiyota's August 2014 opinion lacked both detail and clear reasoning; and it was not supported by the previous DHS examinations (nor by the later DHS examinations), which show the August 2014 report to be "an anomaly."  Id.  Third, Plaintiff contests the ALJ's assertion that Dr. Kiyota's seven DHS reports were "not consistent with the medical and other evidence." Opening Br. at 26-27.  Plaintiff argues the reports were in fact supported by Dr. Wingert's statement that Plaintiff could maintain concentration and attention in a structured setting, adopted by the ALJ, and were consistent with Dr. Myers's opinions.  Id.

While the Commissioner acknowledges the similarity
between the disability standards used by the State of Hawaii DHS
program and the Social Security Administration, the Commissioner
argues that "Dr. Kiyota had the opportunity to certify that
Plaintiff was permanently disabled and should apply for Social
Security benefits every single time she examined Plaintiff; but
she never checked that box." Ans. Br. at 24. The Commissioner
further responds that the ALJ properly rejected Dr. Kiyota's
check-box forms as limited in terms of providing any detailed
rationale, and internally contradictory where Dr. Kiyota
assigned Plaintiff a GAF score of 55 but stated Plaintiff was
unable to work. Ans. Br. at 22-23.

### iii. Analysis

#### 1. The Relationship Between the State of Hawaii's Disability Program and the Social Security Administration's Disability Program

The ALJ did not address whether Dr. Kiyota's State of
Hawaii DHS reports were undermined or validated by the
relationship between the State of Hawaii's disability benefits
program and the Social Security Administration's disability
benefits program. See generally AR 36-37. "[A]dministrative
law judges are not bound by findings made by state agency or
other program physicians and psychologists, but they may not
ignore these opinions and must explain the weight given to the
opinions in their decisions." Henderson v. Astrue, 634 F. Supp.

2d 1182, 1191 (E.D. Wash. 2009) (citing SSR 96-6p). Here, the
ALJ considered Dr. Kiyota's DHS reports and explained the weight
given to them. AR 36. The ALJ was not bound by the findings in
Dr. Kiyota's DHS reports and did not rely on the relationship
between the State program and Social Security Administration
program in weighing the reports. See generally AR 36-37. The
Court therefore declines to weigh that factor here. Bray, 554
F.3d at 1225 ("[L]ong-standing principles of administrative law
[that] require us to review the ALJ's decision based on the
reasoning and factual findings offered by the ALJ—not post hoc
rationalizations that attempt to intuit what the adjudicator may
have been thinking.").

    This Court's conclusion is not changed by the
Commissioner's argument that Dr. Kiyota did not find Plaintiff
"permanently disabled" and chose not to refer her for SSI
benefits by checking a box in the evaluation form. Ans. Br.
at 24. Again, the ALJ made no findings whatsoever on this point
and the Court has no power to "assess the ALJ's reasoning with
respect to [the doctor's] completion of the forms when the
record does not provide any findings by the ALJ on the issue."
Nicholson v. Berryhill, No. 17-00508 HG-KJM, 2018 WL 6198272, at
*14 (D. Haw. Nov. 28, 2018).

### 2. Check-Box Forms

The Court next finds the ALJ was permitted to credit the written form of Dr. Kiyota's August 2014 over the mostly check-box form of Dr. Kiyota's DHS reports. Courts have held that it may be proper in some instances for an ALJ to assign less weight to an opinion because of the cursory nature or format of the opinion; for example, a "check-box form report of a single examination." Henderson, 634 F. Supp. 2d at 1192; see also Crane, 76 F.3d at 253 ("The ALJ, however, permissibly rejected [the evaluations] because they were check-off reports that did not contain any explanation of the bases of their conclusions."); Batson v. Comm'r of Soc. Sec., 359 F.3d 1190, 1195 (9th Cir. 2004) (holding that ALJ properly discounted treating doctors' opinions because they were in the form of a checklist without supportive evidence). Compare Garrison, 759 F.3d at 1013 (9th Cir. 2014) (finding an ALJ erred by rejecting the testimony of a treating doctor where the ALJ "failed to recognize that the opinions expressed in check-box form . . . were based on significant experience with [the claimant] and supported by numerous records").

The Court finds the inconsistencies between Dr. Kiyota's August 2014 report and her seven DHS reports surprising. Dr. Kiyota's seven DHS reports, spanning between June 2013 to March 2016, consistently have the box checked indicating Plaintiff is at least "moderately limited" in her

ability to adapt and cope with a low demand, entry level job. AR 382, 562, 567, 574, 579, 585, 590. Yet on the August 2014 report, Dr. Kiyota indicates that "yes," Plaintiff is capable of adapting/coping with a low-demand, entry-level job. AR 386. The seven DHS reports also, at various times, have boxes checked indicating Plaintiff is incapable of maintaining attention and concentration in simple, repetitive tasks at least half of the time and is incapable of regularly attending to a routine and maintaining a schedule at least half of the time. AR 379-82, 558-90. Yet on August 2014, Dr. Kiyota indicates that "yes," Plaintiff is capable of understanding and remembering simple work instructions, and "yes," Plaintiff is capable of maintaining regular job attendance and persisting at simple, repetitive work tasks on a consistent basis. AR 385.

Despite these inconsistencies, the ALJ's decision to credit short-form responses over check-box responses was not here in error. Where Dr. Kiyota's reports facially conflicted, it was reasonable to assign greater weight to written responses over check-boxes, particularly where the ALJ found the written responses better supported by Dr. Kiyota's own findings, such as by the provided GAF score.[15/] Batson, 359 F.3d at 1195 (9th Cir.

_____

[15/] "Although GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a
(Continued . . .)

2004) ("When presented with conflicting medical opinions, the ALJ must determine credibility and resolve the conflict.").

### 3. Consistency with the Record

As discussed in this Court's review of the record generally, supra, the record in this case was varied and conflicted. The conclusions in Dr. Kiyota's seven DHS reports are consequently consistent with certain parts of the record, including many of the conclusions of Plaintiff's treating doctor, Dr. Myers, and a few of the conclusions of Dr. Wingert. The DHS reports are also inconsistent with certain parts of the record, including Dr. Kiyota's August 2014 report, certain findings of Dr. Myers (specifically in Dr. Myers's August 2014 report, which the ALJ found contained some detailed findings regarding Plaintiff's capabilities), numerous conclusions of Dr. Wingert, the conclusions of Dr. Jonas, and the conclusions of the two State agency psychologists. The ALJ's finding that Dr. Kiyota's reports were not consistent with the record was substantially supported by the evidence.

## VI.   Whether the ALJ Erred in His Credibility Finding

"In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis." Molina v.

---

useful measurement." Garrison, 759 F.3d at 1003 n.4. The ALJ here appropriately considered the GAF score as a useful measurement supporting Dr. Kiyota's additional conclusions regarding Plaintiff's ability.

<u>Astrue</u>, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing <u>Vasquez v.</u>
<u>Astrue</u>, 572 F.3d 586, 591 (9th Cir. 2009)). "First, the ALJ
must determine whether there is 'objective medical evidence of
an underlying impairment which could reasonably be expected to
produce the pain or other symptoms alleged.'" <u>Id.</u> (quoting
citing <u>Vasquez</u>, 572 F.3d at 591). "If the claimant has
presented such evidence, and there is no evidence of
malingering, then the ALJ must give 'specific, clear and
convincing reasons' in order to reject the claimant's testimony
about the severity of the symptoms." <u>Id.</u>

  "'The ALJ must specifically identify what testimony is
credible and what testimony undermines the claimant's
complaints.'" <u>Vertigan</u>, 260 F.3d at 1049 (quoting <u>Morgan v.</u>
<u>Comm'r of Soc. Sec. Admin.</u>, 169 F.3d 595, 599 (9th Cir. 1999)).
"The fact that a claimant's testimony is not fully corroborated
by the objective medical findings, in and of itself, is not a
clear and convincing reason for rejecting it." <u>Id.</u> In
addition, "[a] finding that a claimant's testimony is not
credible must be sufficiently specific to allow a reviewing
court to conclude the adjudicator rejected the claimant's
testimony on permissible grounds and did not arbitrarily
discredit a claimant's testimony regarding pain." <u>Brown-Hunter</u>
<u>v. Colvin</u>, 806 F.3d 487, 493 (9th Cir. 2015).

  **iv. Plaintiff's Testimony and the ALJ's Analysis**

Plaintiff provided testimony regarding her difficulty concentrating, her feelings of incompetence to handle basic tasks and social situations, and her need for frequent breaks to go lie down. AR 58-60, 79-82; see also AR 32. Plaintiff testified that she engages in activities of daily living, but that she frequently takes breaks during these activities. AR 59 ("between 2:00 and 4:00 every single day I -- I may be in the middle of something, whether it's either cooking or trying to clean the house or something, and I have to just stop and go and lay down on my bed"); AR 80 ("I always like take on this big task and I'm in the middle of it, and then I have to go take a break."); AR 81 ("I started cooking and I'm like, oh, my God, I can't handle it, it's too much for me. I went to my room and [my kids] finished everything."). Regarding her need for breaks, Plaintiff testified that she needs four breaks during the day, for approximately one hour at a time. AR 58-59.

At step one, the ALJ considered this evidence and concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. AR 32. At step two, the ALJ found that Plaintiff's statements regarding the "intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Id. The ALJ cited

Plaintiff's clinical profile symptom checklist showing a low or mild level in areas of concern, the Beck Depression Inventory-II showing moderate levels of depression, and her average IQ. AR 33.  The ALJ reviewed Plaintiff's abilities to perform daily functions, including her grooming habits, driving her children to and from school, doing some housework, and preparing a meal using the microwave.  Id.  The ALJ acknowledged that Plaintiff testified that her children are always helping her with meals and she needs assistance shopping because she cannot remember what to buy.  Id.

The ALJ concluded that Plaintiff's "subjective complaints of inattention, need for frequent breaks, inability to handle stress, and other related symptoms, along with the clinical record and other evidence," supported limitations but did not support Plaintiff's inability to work.  AR 38.  The ALJ found Plaintiff's allegations that she could not get through a workday were not supported by (1) the clinical findings and psychological test results, and the evidence overall; (2) evidence of Plaintiff's activities of daily living; (3) Plaintiff's record of conservative treatment; and (4) Plaintiff's demeanor at the hearing.  AR 37-38.

### v. The Parties' Arguments

Plaintiff argues that, although the ALJ did not reject Plaintiff's testimony outright, he addressed her inattention and

need for breaks by limiting her to simple, routine, repetitive tasks, occasional changes in setting, and no assembly-line work. Opening Br. at 29. She states these limitations would not allow her the breaks that she testified she needs. Opening Br. at 30. Although the ALJ considered multiple aspects of Plaintiff's testimony, Plaintiff's briefing specifically takes issue with the ALJ's failure to incorporate Plaintiff's need for frequent breaks. Opening Br. at 28-30; Reply Br. at 13-14.

The parties disagree over whether the ALJ's four stated reasons for discounting Plaintiff's allegations were sufficient. Ans. Br. at 29-32; Reply Br. at 13-14. The Commissioner argues that the ALJ compared Plaintiff's testimony to objective medical evidence, but Plaintiff replies that this argument fails where the ALJ improperly rejected objective findings. Ans. Br. at 29-30; Reply Br. at 13. The Commissioner argues that the ALJ discussed evidence of Plaintiff's daily living throughout his decision, but Plaintiff replies that these activities are not inconsistent with her need for breaks. Ans. Br. at 30-31; Reply Br. at 13. The Commissioner argues Plaintiff's record of conservative healthcare supports the ALJ's decision, but Plaintiff replies that Plaintiff's treatment is not conservative, nor is more care necessary to substantiate her need for breaks, nor is there adequate availability of treatment available. Ans. Br. at 32-33; Reply Br. at 14. Finally, the

Commissioner argues that the ALJ properly relied on his own observations at the hearing, but Plaintiff replies that the ALJ mischaracterized her demeanor in his descriptions.  Ans. Br. at 33; Reply Br. at 14.

### vi. Analysis

Here, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," which satisfies the first step of the analysis.  AR 32; see <u>Molina</u>, 674 F.3d at 1112.  The ALJ then concluded that Plaintiff's testimony concerning the "intensity, persistence and limiting effects of these symptoms [is] not entirely consistent with the medical evidence and other evidence in the record," and the ALJ only gave Plaintiff's testimony partial weight.  AR 32, 38.

Because the ALJ partially rejected Plaintiff's testimony regarding the severity of her need for breaks, the ALJ was required to give specific, clear and convincing reasons. <u>Molina</u>, 674 F.3d at 1112.  The Court turns to the ALJ's four stated reasons.

### 1. Objective Medical Evidence

The ALJ could not reject Plaintiff's testimony as to the severity of her symptoms solely because it was not corroborated by objective evidence.  <u>Light v. Soc. Sec. Admin.</u>, 119 F.3d 789, 792 (9th Cir. 1997).  Once "a claimant who alleges

disability based on subjective symptoms" has produced "objective medical evidence of an impairment" and she has shown the impairment "could reasonably be expected to (not that it did in fact) produce some degree of symptom," then "[t]he claimant need not produce objective medical evidence of the pain or fatigue itself, or the severity thereof." Smolen v. Chater, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (citing Bunnell v. Sullivan, 947 F.2d 341, 344, 347–48 (9th Cir. 1991)). An ALJ "may not reject subjective symptom testimony . . . simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Id. (emphasis in original).

Here, the ALJ found Plaintiff's testimony not fully credible in part because of "the detailed clinical findings and psychological test results." AR 38. As the Court has discussed, the ALJ did not improperly reject medical findings as Plaintiff claims. But "[t]he fact that a claimant's testimony is not fully corroborated by the objective medical findings, in and of itself, is not a clear and convincing reason for rejecting it." Vertigan, 260 F.3d at 1049. Therefore, the Court turns to the other three stated reasons for partially rejecting Plaintiff's testimony.

## 2. Plaintiff's Activities of Daily Living

The ALJ concluded that Plaintiff could get through a workday and maintain attendance for full-time employment based in part on Plaintiff's activities of daily living.  AR 38.

To find a claimant not credible, an ALJ may consider conflicts between a claimant's testimony and her own conduct or internal contradictions in her testimony.  Light, 119 F.3d at 792 (9th Cir. 1997).  Such contradictions can include testimony that a claimant is unable to work, contradicted by evidence that a claimant is able to engage in substantial other activities of daily living.  Batson, 359 F.3d at 1196 ("The ALJ also noted contradictions in the claimant's own testimony about his activities of daily living.  Batson claimed that he could not return to work because of pain, yet he also testified that he tends to his animals, walks outdoors, goes out for coffee, and visits with neighbors.").  The daily activities at issue must "bear a meaningful relationship to the activities of the workplace."  Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007).

Although Plaintiff isolates her need for breaks, the ALJ considered her testimony regarding her limitations as whole.  The ALJ recognized that although Plaintiff "testified that her older, adult children help her with tasks like cleaning and cooking, [she] remains capable of managing her own funds, driving, and shopping."  AR 38.  The ALJ found these tasks contradicted Plaintiff's testimony that she was unable make it

through a workday without several breaks.  Further, the ALJ

found Plaintiff's testimony not only lacked support, but was

specifically contradicted by the medical opinions, where her

treating psychologist Dr. Myers stated Plaintiff had no

limitation in her activities of daily living.  AR 37.  Even

where Plaintiff's "activities suggest some difficulty

functioning, they may be grounds for discrediting" the testimony

provided by Plaintiff "to the extent that they contradict claims

of a totally debilitating impairment."  Molina, 674 F.3d at

1113; see also Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1175

(9th Cir. 2008) (finding an "ALJ sufficiently explained his

reasons for discrediting claimant's testimony" where the record

showed "normal activities of daily living, including cooking,

house cleaning, doing laundry, and helping her husband in

managing finances" which "tend to suggest that the claimant may

still be capable of performing the basic demands of competitive,

remunerative, unskilled work on a sustained basis."); Morgan v.

Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999)

(finding an ALJ provided specific and substantial reasons that

undermined a claimant's testimony of his inability to work where

the ALJ relied on personal observations and on the claimant's

"ability to fix meals, do laundry, work in the yard, and

occasionally care for his friend's child").

The ALJ did not err in finding Plaintiff's daily activities contradicted the severity of her symptoms as alleged.

### 3. Plaintiff's Record of Conservative Health Care

The ALJ also found that Plaintiff's testimony was undermined by her conservative health care record, which did not include the need for acute intervention or other aggressive measures or intensive therapies. AR 38. As discussed above, this circuit permits an ALJ to rely on evidence of conservative treatment. Tommasetti, 533 F.3d at 1039-40. The Court finds the treatment in this case could reasonably be deemed conservative. This is particularly true where the evidence of conservative treatment was only one of four reasons provided for partially rejecting Plaintiff's testimony.

### 4. Plaintiff's Demeanor at the Hearing

The ALJ relied in part on Plaintiff's demeanor during the hearing. At the hearing, Plaintiff "did become tearful," but she "was able to compose herself enough to appropriately and adequately respond to questioning," and "she appeared able to follow the proceedings and she did not ask to take a break during the hearing." AR 37. Given that this demeanor contradicted Plaintiff's assertions regarding her inability to handle any stress, and when viewed in combination with the other

factors the ALJ cited, the Court does not find the ALJ erred in considering Plaintiff's demeanor as described.

## CONCLUSION

For the foregoing reasons, the Court AFFRIMS the Commissioner of Social Security's decision denying SSDI and SSI benefits.[16]


IT IS SO ORDERED.

DATED:  Honolulu, Hawai`i, October 8, 2019.


_____
Alan C. Kay
Sr. United States District Judge


Khan v. Saul, Civ. No. 19-00005 ACK-WRP, Order Affirming the Decision of the Commissioner of Social Security.

---

[16] Plaintiff has requested an award of reasonable attorney's fees and costs pursuant to 28 U.S.C. § 2412(d).  Opening Br. at 30.  That statute permits fees and expenses to be awarded to a prevailing party in a civil action, including proceedings for judicial review of agency action.  28 U.S.C. § 2412(d).  Because this Court is affirming the ALJ's denial of benefits, Plaintiff does not qualify as a prevailing party.  Accordingly, Plaintiff's request is denied.